# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA,
# ORLANDO DIVISION

| | |
|---|---|
| **DigiART, LLC, a Florida Limited Liability Company** ) | |
| ) | |
| **Plaintiff,** ) | **C.A. No. _____** |
| **v.** ) | |
| ) | **DEMAND FOR JURY** |
| **Danny Casale, an Individual** ) | **TRIAL** |
| ) | |
| **Defendant** ) | |

## COMPLAINT

### (Preliminary and Permanent Injunctive Relief Requested)

Plaintiff DigiART, LLC by and through its undersigned counsel, hereby files this suit against Defendant, Danny Casale, and alleges as follows:

## NATURE OF THE CASE

1.      This is a straightforward civil action to remedy material breaches of contract and fraud by Defendant Danny Casale ("Casale"), a digital artist who goes by the name "Coolman Coffeedan."  In May 2021, Casale entered into an agreement with Plaintiff DigiART, LLC ("DigiART"), which expressly gave DigiART the *exclusive* right to market and offer for sale *all* non-fungible tokens ("NFTs") created by Casale during the term of the agreement, which expires on ***May 2, 2022*** (the "DigiART Agreement").

2.     Under the DigiART Agreement, DigiART and Casale were to split net sale proceeds of any of Casale's NFTs on a 50-50 basis.  DigiART, through partner Marcel Katz, promised to take steps to promote Casale's digital and physical art and raise his public profile and exposure to an international art collector base.  DigiART did that and much more, spending considerable resources (time and money) over the course of several months, to feature Casale in prominent physical and digital exhibitions and otherwise heavily promote his projects.  For example, Mr. Katz launched Casale's official debut at Miami Art Week during the renowned Art Basel event in December 2021, which featured over 250 leading international galleries. To launch Casale's debut, Mr. Katz organized a pop-up exhibition and experience to feature Casale's work, called "Ur Special Coffee" at The Bagel Club – Miami.[1] The pop up historically sold the world's most expensive cup of coffee at $1,000 per paper cup, with each cup featuring a one-of-a-kind original artwork by Casale.  This event garnered substantial press from a wide variety of sources.

3.     None of that mattered.  As detailed below, Casale decided to wholly ignore his contractual obligations.  Recently, he began marketing and offering for sale online over 10,000 NFTs, in plain breach of his obligations to DigiART. Casale's collection is marketed under the moniker "Coolman's Universe" and

---

[1] Mr. Katz indeed sacrificed significant time promoting his own brand to do work for Casale.

2

currently has a trading volume on the online platform OpenSea of more than 18,000 Ethereum, *i.e.*, over $50 million (the "offending NFTs").

4.      Under the express terms of the DigiART Agreement, Casale is required to provide to DigiART 50% of the net proceeds from the sale of the offending NFTs on a first-market basis, and otherwise share second-market royalties, both of which he has completely failed to do.  Despite DigiART's attempt to resolve this issue out of court with its contracting partner, Casale has flatly refused to comply with his obligations.

5.      Instead, Casale has falsely claimed—despite *transmitting his signature with full knowledge of the terms of the DigiART Agreement*—that no agreement was ever actually executed and there was never a "meeting of the minds" between the parties.  Casale knows this is flatly untrue.  Nevertheless, when DigiART notified him of his breach, he threatened DigiART, flippantly claiming that it is "not surprising" that the company would bring this case because "success breeds litigation."  Casale's disturbing refusal to acknowledge his obligations is revealing of his bad faith.

6.      *But even if* Casale were not misrepresenting the facts about the formation of the contract (and he is), at a minimum, Florida law provides a clear basis for enforcement of an obligation under the legal doctrine of promissory estoppel, where one party (here, DigiART) relies on the material representations and

promises of another (Casale) that a contractual obligation *does* exist.  As noted, DigiART expended considerable time and effort promoting Casale's art, offering him a platform, and building his brand, based on his express representations that there was an enforceable contractual relationship that required him to share the profits from his NFT projects during the term of the agreement.

7.     For similar reasons, Casale's recent claim that there was "no agreement of any kind" between Casale and DigiART is revealing of a more disturbing fact: under Casale's admitted view of the world, he *defrauded* DigiART.  Put simply, he was well aware, through weeks of negotiations, that DigiART agreed to help promote him and build his brand in exchange for the promise that Casale, among other things, would share the proceeds from any new NFT projects on a 50-50 basis. He repeatedly promised orally and in writing to DigiART that he would abide by these terms, and even transmitted his email signature expressly assenting to them. Yet before the ink was barely dry, he began plotting his Coolman's Universe project and the offending NFTs.  In other words, Casale fraudulently induced DigiART to expend its time, money, and energy building his brand, promoting his work, and establishing him as a reputable name in the digital and physical fine art world.  Once he benefited from DigiART's work, he pulled the trigger on his scheme, and has profited to the tune of millions of dollars, which he has refused to share with DigiART.

## PARTIES

8.     Plaintiff DigiART, LLC is a limited liability company organized and existing under the laws of Florida, having its principal place of business at 4700 Millenia Boulevard, Suite #400, Orlando, Florida 32839.  DigiART has continuously operated in the Orlando, Florida area since April 2021.  DigiART has two members: REJL Holdings, LLC and Collectifi, LLC, both of which are Florida limited liability corporations that own 50% of DigiART, respectively.  Collectifi, LLC is owned 100% by Marcel Katz, a Florida resident.  The members of REJL Holdings, LLC are OSC Group Holdings, Inc., a Florida corporation, and J. Levine Holdings, LLC, a Florida limited liability company.  The individual owner of J. Levine Holdings, LLC is a Florida domiciliary.

9.     Upon information and belief, Danny Casale is a resident of the State of New York, who works frequently in California.  Casale does business on the online platform OpenSea using the moniker "Coolman's Universe" under the account name "coolman_coffeedan."

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332(a), because DigiART (and its respective members) and Casale are citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.     Moreover, this Court has jurisdiction over Casale pursuant to Fla. Stat. §§ 48.193(1)(a)(7) and (9); and 685.102 because this action arises out of and relates to a contract which bears a direct relation to the State of Florida.  Indeed, the DigiART Agreement contains a choice of law provision providing both that Florida law applies, pursuant to Fla. Stat. § 685.101, and that Casale submits to the exclusive jurisdiction of the courts of this state in and for Orange County, Florida.  In addition, Casale has engaged in material breaches of contract, as described more specifically below, which have caused and continue to cause injury to DigiART within the Orlando Division of the Middle District of Florida.

12.     Venue is likewise proper in this Court because Casale submitted to the jurisdiction of this Court by executing an agreement with DigiART providing that all disputes shall be litigated in Florida state or federal courts only.  And, venue is also proper under 28 U.S.C. § 1391(b)(2), because the events giving rise to the claims in this action occurred in this District.

## FACTS

13.     DigiART is a venture of Collectifi, LLC and REJL Holdings—a subsidiary of OCS Group Holdings, Inc., an entity owned by famed businessman Robert Earl, which, among other things, does business under the moniker Earl Enterprises.  Earl Enterprises is a restaurant, hospitality, and entertainment brand holding company and the owner of, among other assets, Planet Hollywood, Buca di

Beppo, Bertucci's, Brio Italian Grille, and Bravo Italian Kitchen.  Collectifi, LLC is managed by Marcel Katz.  Marcel Katz is a renowned art curator, promoter, and personality, who notably has been a dealer of artwork from the likes of Andy Warhol, Jean-Michel Basquiat, and Keith Haring.

14.     Over the last several months, DigiART has contemplated, and taken steps toward, expanding its portfolio by launching an immersive art experience in the "Metaverse,"[2] a Web3[3] technical services platform, and a digital art marketplace featuring digital art and collectibles.

15.     As part of this endeavor, DigiART has partnered with certain digital artists to create NFTs on an exclusive basis for DigiART.  NFTs are cryptographic assets located on a blockchain with unique identification codes and metadata that distinguish them from one another.  Each NFT is unique and irreplaceable, *i.e.*, non-fungible.  In other words, NFTs are digital representations of assets.  NFTs often can represent real-world items like artwork and real estate.  In fact, much of the current market for NFTs is centered around collectibles, such as digital artwork, sports cards, and rarities.[4]

---

[2] The metaverse effectively refers to a virtual world where users can interact and engage in experiences as though in the real world.

[3] Web3 is an idea for a new iteration of the World Wide Web based on blockchain technology, which incorporates concepts including decentralization and token-based economics.

[4] *See* Rakesh Sharma, *Non-Fungible Token (NFT) Definition*, Investopedia (Feb. 26, 2022), https://www.investopedia.com/non-fungible-tokens-nft-5115211

16.     Prior to DigiART's formation, Mr. Katz discovered Casale through online platforms where Casale displayed his illustrations and animations.  At the time, Casale was generating revenue through advertisements, merchandise, and sponsorships on his online platform, but did not know how to monetize his physical and digital artwork.

17.     Recognizing Casale's potential, Mr. Katz, on behalf of an entity named Art Plug—an agency that handles art promotion and distribution—approached Casale and expressed to him a plan to monetize and promote his work, including beginning with a strong presence in the physical fine art market, which would in turn lead to a stronger digital market by placing physical works in collections all over the world.  Casale agreed with this approach, and entered into an agreement with Art Plug to promote and distribute his physical art.  Pursuant to that agreement, Art Plug was Casale's distributor of his physical art, and proceeds from sales of that artwork were split 50-50 on online physical sales and 60-40 on physical artworks shown in exhibitions between Art Plug and Casale (60% in favor of Art Plug).

18.      As part of this representation, Casale had weekly meetings with the Art Plug team regarding distribution and promotion of his physical art.

19.     In early 2021, Art Plug began conversations with Robert Earl, on behalf of REJL Enterprises, to form DigiART.  DigiART was formed on April 12, 2021.

20.     During weekly meetings with Casale regarding his physical and digital art collections, representatives of the newly formed DigiART informed Casale about the new business venture.   DigiART representatives, including Mr. Katz and Christopher Martinez, told Casale about DigiART's connection to Robert Earl, including his ownership of Planet Hollywood.

21.     Between March 2021 and April 30, 2021, DigiART representatives had over five phone calls with Casale to discuss a potential joint partnership with DigiART whereby Casale would create NFTs on an exclusive basis for DigiART, and DigiART would act as Casale's exclusive distributor and promoter, on nearly identical terms as his arrangement with Art Plug, including that sales of NFTs created by Casale would be split 50-50 between Casale and DigiART.

22.     On these phone calls, Casale expressed enthusiasm on many occasions about entering into a partnership with DigiART, and in particular, with Robert Earl because he was excited to tie himself to the well-known Planet Hollywood brand and Collectifi, a subsidiary company of established art brand The Art Plug.   Casale expressed that these associations would bring him "credibility" as an artist.  Of note during this period, Casale repeatedly expressed in sum and substance that he intended to collaborate on a 50-50 basis with DigiART for his future NFTs.

23.     Further, during the discussions, Casale, who did not know much about NFTs at the time, asked countless questions about blockchain technology and the

potential partnership with DigiART, including how the technology worked, and how DigiART planned to market and promote his NFTs.

24.     After having several discussions, on April 29, 2021, Mr. Martinez, in a group text message with Casale and Mr. Katz stated, "Hey Dan! Sorry for the delay on the contract for NFTS.  Roberts [sic] attorney and our NFT experts just finished finalizing the formal details.  Look for an email today with the contract.  The split is 50-50 on the initial drops and all resale royalties on secondary market will go to you."  Later that day, Casale responded in the group text message, "cool thanks guys."

25.     On April 30, 2021, DigiART transmitted an agreement (*i.e.*, the DigiART Agreement) to Casale to create NFTs for DigiART on an exclusive basis. In the email transmitting the DigiART Agreement to Casale, Mr. Martinez again explained that agreement provided for a "50-50 split" between Casale and DigiART.

26.     Shortly after that email, on April 30, 2021 at 4:25 Mr. Martinez texted the group chat with Mr. Katz and Casale stating, "hey Dan, email sent.  Lmk [let me know] if you have questions."  Danny responded in the group text message shortly thereafter stating, "Awesome thanks, reviewing this afternoon.  Stoked [hang loose emoji]."

27.     After receiving this email and text, Casale asked a single clarifying question over email regarding who would be responsible for "minting the NFTS."

28.     After receiving a response to his question, *that same day*, on April 30, 2021, Casale executed and delivered a signed contract to DigiART, exclaiming, "Attached is the signed agreement!  Super stoked for everything to come."  Attached hereto as Exhibit A is the executed version of the DigiART Agreement.

29.     In pertinent part, the DigiART Agreement secured DigiART the exclusive right to market and offer for sale all NFTs produced by Casale during the term of the Agreement, defined as a one-year term beginning on May 2, 2021, meaning that the first term is set to expire on May 2, 2022.

30.     In exchange, DigiART agreed to use all "commercially reasonable efforts" to diligently market and advertise the NFTs created by Casale, introduce Casale to various selling platforms, and assist Casale with digitizing/tokenizing NFTs, among other things, to benefit Casale.  (*See* Exhibit A (DigiART Agreement) at "Services.")

31.     To effectuate DigiART's exclusive right to market and offer for sale NFTs produced by Casale during the term, he was in turn required to offer all proposed NFTs to DigiART in the first instance for DigiART's approval or rejection. Under the contract, only if DigiART *rejected* a proposed NFT was the work deemed not covered by the DigiART Agreement.  (*Id.* at § 1.)

32.     Further, under the DigiART Agreement, Casale and DigiART are each entitled to 50% of the net sale proceeds for first-market offerings, as defined therein,

of each NFT sold.  (*Id.* at § 2.)  Specifically, the agreement defines "Net Sale Proceeds" as follows:

> the gross consideration from all sources paid for an NFT, less all platform fees for initial and resales, gas fees (the fee to bind a digital work to the blockchain, ranges from $.01 to $250 per piece off of various different things, will be shown direct proof of each transaction), and reasonable, out-of-pocket expenses incurred by Company to market and sell the NFTs.  (*Id.*)

33.    DigiART lived up to its end of the DigiART Agreement.  Among other things, it provided significant guidance and promotional work for Casale.

34.    In particular, Mr. Katz provided substantial guidance to Casale.  Mr. Katz directed and instructed Casale on colorways, techniques, and direction, all the while conversing on how to implement Casale's physical work into his future digital collection of NFTs with DigiART.  Mr. Katz purchased canvases and other supplies for Casale to create physical art, and Casale utilized Mr. Katz's home studio on several occasions to create all of the artworks for various exhibitions and collections to promote his brand.

35.    In addition, it was *Mr. Katz*, in the lead up to Miami Art Week in December 2021, who provided Casale with the concept that ultimately became Casale's signature NFT design—a repeated cat figure.  Indeed, as discussed below, the repeated cat figure is a defining characteristic of the 10,000 NFT universe composing the offending NFTs and for which Casale is now famous.

36.     Mr. Katz also spent considerable time, resources, and energy promoting and distributing Casale's digital artwork and introducing him to markets and platforms around the world.  Significantly, Mr. Katz promoted Casale's artwork alongside Salvador Dali—the most recognized artist of surrealism—on his personal website, marcelkatzart.com.

37.     In addition, Mr. Katz organized a pop-up installation called "Ur Special Coffee" on behalf of Casale during Miami Art Week where Art Basel takes place— a leading global platform connecting collectors, galleries, and artists from all over the globe.  Mr. Katz had been carefully conceptualizing the "Ur Special Coffee" since 2020.  Indeed, Mr. Katz, familiar with the success of Mr. Earl's restaurants, understood the profitability of art-inspired cafes.  He therefore conceptualized the coffee shop takeover as an art inspired café with both physical and digital art that could launch Casale into relevance and profitability.

38.     To make his vision into a reality, Mr. Katz strategically made connections to various components and people through his personal network.  The pop up installation was hosted at a coffee shop called The Bagel Club – Miami.  As part of the exhibition, Mr. Katz and Casale took over the shop with Casale's physical and digital art.  Mr. Katz set up a projector screen inside the shop that showcased Casale's animations, demonstrating the viability of Casale's future digital NFT collection with DigiART.  By doing so, Mr. Katz was able to promote Casale's

digital collection on site to patrons and collectors, laying the groundwork for a successful NFT collector base.

39.     Planning for the pop up began months before it went up.  As early as September 24, 2021, weekly meetings were held on Wednesdays at 2:00 p.m. with Casale, Mr. Katz, and other members of Casale's assigned team at DigiART.  During these meetings, the team brainstormed the concept for the pop up—including the operations of the shop during the takeover; press relations and strategy; marketing strategies, including sponsorship decks for the event; and most importantly, art direction, including specifically Mr. Katz working with Casale to structure the art inventory for the takeover.[5]

40.     The pop-up exhibition, called "Ur Special Coffee," was a huge success and an ode to Casale's art.  Casale and Mr. Katz painted the outside of The Bagel Club with his repeated cat image based on Mr. Katz's concept.  The stencil designs for the coffee shop were made at Mr. Katz's home with Emily Lesch, Casale's assistant, while Casale was mysteriously unavailable.  On information and belief, Casale was using this time to plot his "Coolman's Universe" collection.

41.     In addition to painting the outside of The Bagel Club, Casale redecorated the interior and exterior of the coffee shop with displays of his original

---

[5] In order to promote the event, Mr. Katz also ensured that Casale's NFT was featured on Art Basel's homepage, alongside other top artists featured at the event.

artwork, printed artwork, and a digital exhibition displaying NFT-inspired animations created by Casale, all under the direction of Mr. Katz.

42. Mr. Katz personally directed and invested funds into an extensive proper media campaign, to ensure Casale obtained the most media exposure possible. In fact, Mr. Katz asked two collectors from his personal network to attend the "Ur Special Coffee" pop up and *buy* the $1,000 cup of coffee, which were out of the price range of many attendees. "Ur Special Coffee" and Casale made press waves by historically selling two of the world's most expensive cup of coffee at $1,000 per paper cup, with each cup featuring artwork by Casale, depicting the popular repeating cat image. A picture of the now-famous $1,000 coffee cup featuring Casale's art is depicted below as **Figure A**:



**(Figure A)**

43.     Pictures of the outside of The Bagel Club during the "Ur Special Coffee" pop up, picturing Casale's art, are depicted below in **Figure B**:

 

**(Figure B)**

44.     This was not all.  Mr. Katz organized other events during Miami Art Week to promote Casale's digital artwork, including throwing the "Pussy Cat Party" on December 4, 2021 at the Gold Rush Cabaret in Miami.  Mr. Katz executed an exhibition at the venue that displayed Casale's animations and characters to promote his digital market.  A promotional flyer for the event posted on Gold Rush Cabaret's Facebook page is depicted below as **Figure C.**



**(Figure C)**

45.     In addition, during Art Basel, Mr. Katz organized a digital NFT auction of one of Casale's NFTs with FTX, a popular cryptocurrency exchange, with DigiART's approval in order to further establish a market for Casale's NFT collection.  Mr. Katz *personally* won the NFT auction in order to establish a baseline market for Casale's future NFT line with DigiART.

46.     At a dinner later that week, on December 7, 2021, at Tap 42 in Midtown Miami with Valerie Hodges, Kimberly Driedger, and Casale, Mr. Katz expressed how excited he was to be able to set the baseline market for Casale's forthcoming NFTs with DigiART at 8.5 Solana (another cryptocurrency), which he managed to do by winning the FTX auction.  Casale once again never mentioned to Mr. Katz his pending "Coolman's Universe" NFT collection.

47.     To further strategize for and protect Casale's eventual NFT collection with DigiART, Mr. Katz purchased ENS domain names (which are special domain names for NFTs) for "URSPECIAL.ETH" & "SPESHIES.ETH," which he transferred to Casale.

48.     And to top it off, Mr. Katz placed numerous strategic phone calls and text messages and held several in person meetings with various collectors to proliferate Casale's digital market.  For example, Mr. Katz placed a Casale original artwork in Jacob Martin's office in order to procure his NFT market.  Mr. Martin is

an NFT influencer, who operates under the Instagram and Twitter account name, @thenftattorney.[6]

49.     Despite the terms of the DigiART Agreement, and DigiART's performance of its own obligations, DigiART recently discovered that Casale has been marketing and offering for sale over 10,000 offending NFTs, including, on information and belief, through Metalink. (https://twitter.com/metalinklabs/status/1477707052151554049.)   Currently, the offending NFTs are displayed and traded on the platform OpenSea.

50.     Specifically, Casale has made the offending NFTs available using the account name "coolman_coffeedan" and the platform moniker, "Coolman's Universe."  (*See* https://opensea.io/collection/coolmansuniverse.)  Examples of the offending NFTs are depicted below in **Figures D** and **E**.



**(Figure D)**

---

[6] Mr. Katz also used his personal connection with Nick Pennington—now a collector of Casale's physical artworks—to set up a second mural for Casale, depicting his NFT collection in Vancouver, Canada.



**(Figure E)**

51.     Casale has handsomely profited from his breach of contract.  According to press releases, Casale's "Coolman's Universe" collection sold for $3.6 million in 3 minutes on metalink.[7]  That same collection of offending NFTs has now generated a secondary trading volume of over 18,000 Ethereum, or over $50 million on OpenSea, with a 5.6% royalty to Casale on all secondary trading, which converts to over $3 million in royalties for secondary trading alone.  On information and belief, Casale has personally received ***millions of dollars*** from first-market sales of the offending NFTs, 50% of which were required to be paid to DigiART.

52.     Casale has never offered any of the offending NFTs to DigiART for its acceptance or rejection prior to marketing and offering them for sale.  Casale has also never provided DigiART its 50% share of the net sale proceeds from his sale of the offending NFTs, as required under the DigiART Agreement.

---

[7] Jennifer Farrington, *Danny Casale's NFT Collection Sold for $3.6 Million in 3 Minutes*, Market Realist (February 14, 2022)
https://instagram.com/thenftattorney?utm_medium=copy_link

53.     More troublingly, it appears that Casale began plotting to launch his own NFTs—without DigiART—almost immediately after the contract was signed. Indeed, just weeks after the agreement was executed, Casale minted a handful of NFTs on OpenSea without consulting with DigiART.  Mr. Katz became aware of these NFTs, and promptly indicated to Casale that he needed to take them down in advance of discussions with potential promotional partners.  On information and belief, Casale was floating a trial balloon to figure out how to mint NFTs on his own. This would eventually become the basis to launch his own collection through Coolman's Universe, *i.e.*, the offending NFTs.

54.     As a result of Casale's misconduct, on February 18, 2022 and March 2, 2022, DigiART sent Casale letters, providing him with ample notice and an opportunity to cure his breaches of DigiART's exclusivity rights and his failure to provide DigiART with its 50% share of the proceeds from the offending NFTs.

55.     Casale sent DigiART two flippant responses indicating his refusal to comply with his contractual obligations, necessitating this lawsuit.[8]

---

[8] Although the DigiART Agreement provides Casale with 30 days' right to notice and cure, Casale has made clear in his responses to DigiART's demand letters that his refusal to comply is in fact his final decision.  In other words, Casale has indicated that there is nothing to cure, thus ripening DigiART's contract claim.

## COUNT I – BREACH OF CONTRACT

56.    DigiART realleges and incorporates paragraphs 1 thru 55 above, as if fully set forth herein.

57.    DigiART executed the DigiART Agreement with Casale on March 2, 2021. (*See* Exhibit A.)  The DigiART Agreement is a valid and enforceable contract, which was signed by Casale.

58.    The DigiART Agreement defines "Commitment" as "[DigiART] shall have the EXCLUSIVE right to market and offer for sale all NFTs produced by Artist during the Term."  The term of the DigiART Agreement is one year from May 2, 2021, or to and through May 2, 2022.

59.    Section 1 of the DigiART Agreement further provides that:  "For NFTs produced by [Casale] pursuant to the Commitment, [DigiART] shall have the right to accept or reject for sale *all* proposed NFTs by [Casale]."  (emphasis added).  In addition, Section 1 states, "if [Casale] receives a bid or sale request for an NFT, or other sale related inquiry, [Casale] shall refer all such inquiries to the [DigiART]."

60.    Section 2 of the DigiART Agreement states:  "If and when an NFT sells, the parties shall split the Net Sale Proceeds . . . pursuant to the Allocation of Net Sale Proceeds."  The DigiART Agreement defines the "Allocation of Net Sale Proceeds" as 50% to DigiART and 50% to Casale.

61.    Section 2 of the DigiART Agreement also states:  "Upon the sale of an NFT, the gross sale proceeds shall be remitted directly to [DigiART]'s digital wallet."

62.    Casale is currently marketing and offering for sale 10,000 NFTs (viewable on the online platform OpenSea), which were created by him under his alias coolman_coffeedan and offered for sale under his online moniker, Coolman's Universe.

63.    Casale has not presented any of the 10,000 NFTs created by him during the term to DigiART for its acceptance or rejection as required under Section 1 of the DigiART Agreement.

64.    Casale has also not provided DigiART with its 50% Allocation of Net Sale Proceeds, or the gross sale proceeds from any sale of an NFT created by Casale during the term, in violation of, among other sections, Section 2 of the DigiART Agreement.

65.    Accordingly, Casale has materially breached the DigiART Agreement by, without limitation:

    a.  marketing and otherwise offering for sale over 10,000 NFTs created during the term of the DigiART Agreement, without first presenting each NFT to DigiART "to accept or reject for sale all proposed NFTs by Artist"; and

b. failing to remit to DigiART its 50% Allocation of Net Sale Proceeds or gross sale proceeds from sales of Casale's NFTs, in an amount that, on information and belief, is 50% of several millions of dollars.

66. DigiART seeks specific performance, and both preliminary and permanent injunctive relief, to compel Casale to comply with his contractual obligations and, consistent with Section 2 of the DigiART Agreement, compel the "gross sale proceeds [from the offending NFTs] . . . directly to [DigiART's] digital wallet."

67. As a direct and proximate result of Casale's material breaches of contract, DigiART has been damaged and continues to be damaged. DigiART is entitled to all damages available under applicable law, including compensatory, consequential, and incidental damages.

68. Finally, Section 7 of DigiART Agreement incorporates Standard Terms and Conditions, which are "incorporated by reference." Those standard terms provide that the "prevailing party shall be entitled to recover its reasonable attorney's fees and costs from the non-prevailing party." (Exhibit A at Standard Terms & Conditions, § 14.) DigiART accordingly seeks such fees.

## COUNT II – PROMISSORY ESTOPPEL

69. DigiART realleges and incorporates paragraphs 1 thru 55 above, as if fully set forth herein.

70.     DigiART had numerous conversations with Casale in March and April 2021, in which DigiART discussed forming a partnership with Casale whereby Casale would create NFTs for DigiART on an exclusive basis, with each side splitting the proceeds of any sale on a 50-50 basis.

71.     Casale repeatedly expressed his enthusiasm for, and his commitment to, this joint partnership, in large part because he wanted to tie his brand name to (1) Robert Earl, the successful businessman associated with DigiART and Planet Hollywood, and (2) Marcel Katz, a notable blue chip fine art dealer of Andy Warhol, Jean-Michel Basquiat, and Keith Haring—knowing that these relationships would in turn solidify a strong NFT market for him.  Casale indicated this relationship would give his own brand "credibility."  Of note, during this time period, Casale repeatedly expressed in sum and substance that he intended to collaborate on a 50-50 basis with DigiART for any NFT drops.

72.     After having several discussions, on April 29, 2021, Christopher Martinez, in a group text message with Casale and Marcel Katz stated, "Hey Dan! Sorry for the delay on the contract for NFTS.  Roberts [sic] attorney and our NFT experts just finished finalizing the formal details.  Look for an email today with the contract.  The split is 50-50 on the initial drops and all resale royalties on secondary market will go to you."  Later that day, Casale responded in the group text message, "cool thanks guys."

73.    On April 30, 2021, DigiART transmitted an agreement (*i.e.*, the DigiART Agreement) to Casale to create NFTs for DigiART on an exclusive basis. In the email transmitting the DigiART Agreement to Casale, Mr. Martinez explained that agreement provided for a "50-50 split" between Casale and DigiART.

74.    Shortly after sending that email, on April 30, 2021 at 4:25, Mr. Martinez texted the group chat with Mr. Katz and Casale, stating, "hey Dan, email sent.  Lmk [let me know] if you have questions."  Casale responded in the group text message shortly thereafter stating, "Awesome thanks, reviewing this afternoon. Stoked [hang loose emoji]."

75.    After receiving this email and text message, Casale asked a single clarifying question over email regarding who would be responsible for "minting the NFTS."

76.    After receiving a response to his question, that same day, on April 30, 2021, Casale executed and delivered a signed contract to DigiART, exclaiming, "Attached is the signed agreement!  Super stoked for everything to come."

77.    Indeed, Casale repeatedly promised orally and in writing to DigiART that he would abide by the terms of the parties' agreement, and even transmitted his email signature expressly assenting to them.

78.    Casale promised and agreed, in other words, to present NFTs created by him to DigiART for acceptance or rejection and to split proceeds of the sale of

26

NFTs created by him during the one year term of the agreement on a 50-50 basis with DigiART.

79.    Upon information and belief, Casale never intended to keep or perform these promises.  Indeed, Casale began plotting to launch his own NFTs—without DigiART—almost immediately after the contract was signed.

80.    Casale's promises were material to DigiART's decision extensively to market and promote his digital collection, as set forth above, and including but not limited to:

   a) Organizing the "Ur Special Coffee" pop up exhibition at The Bagel Club during Art Basel to debut Casale to Miami Art Week;

   b) Engaging in substantial marketing and advertising of Casale's work leading up to Art Basel by featuring his artwork on the homepage of Artplug.com, Marcelkatzart.com and FTX.US alongside other prominent artists;

   c) Organizing a party during Miami Art Week to promote Casale's digital work during Miami Art Week;

   d) Spending substantial time and resources making strategic phone calls, text messages, and holding in-person meetings with collectors;

   e) Strategically placing Casale's artwork in spaces to procure a market for his NFTs;

    f) Purchasing canvases and supplies for Casale to create his art, and allowing Casale to utilize Mr. Katz's home studio on several occasions to create all of the artworks for the exhibitions and collections; and

    g) Directing and instructing Casale on colorways, techniques and direction, and instructing Casale on how to implement the physical work into the future digital collection of NFTS with DigiART.

81.    Casale did not perform as promised, and DigiART has been damaged as a result. Where Casale claims that he never agreed to a contract with DigiART, his willingness to accept months and countless hours of DigiART's promotional work to launch his digital art career make clear that he misled DigiART to benefit from the relationship and DigiART's work, only to cast DigiART to the curb once he figured out alternative channels to sell NFTs.

82.    DigiART seeks specific performance, and both temporary and permanent injunctive relief, to compel Casale to comply with his promises.

83.    Otherwise, as a direct and proximate result of Casale's material breach of his promises, DigiART has been damaged and continues to be damaged, and is entitled to all damages available under applicable law, including compensatory, consequential, and incidental damages.

## <u>COUNT III – MISREPRESENTATION / FRAUD IN THE INDUCEMENT</u>

84.    DigiART realleges and incorporates paragraphs 1 thru 55 above, as if fully set forth herein.

85.    Casale represented that he would present NFTs created by him to DigiART for acceptance or rejection and he would split proceeds of the sale of NFTs created by him during the one-year term of the agreement on a 50-50 basis with DigiART.

86.    In particular, DigiART had numerous conversations with Casale in March and April 2021, in which DigiART discussed forming a partnership with Casale whereby Casale would create NFTs for DigiART on an exclusive basis, with each side splitting the proceeds of any sale on a 50-50 basis.

87.    Casale repeatedly expressed his enthusiasm for engaging in this joint partnership, in large part because he wanted to tie his brand name to Robert Earl, the successful businessman associated with DigiART and Planet Hollywood, and Marcel Katz, a notable blue chip fine art dealer of Andy Warhol, Jean-Michel Basquiat, and Keith Haring, knowing that these relationships would in turn solidify a strong NFT market for him.  Casale indicated this relationship would give his own brand "credibility."  Of note, during this time period, Casale repeatedly expressed in sum and substance that he intended to collaborate on a 50-50 basis with DigiART for future NFT drops.

88.    After having several discussions, on April 29, 2021, Christopher Martinez, in a group text message with Casale and Mr. Katz stated, "Hey Dan! Sorry for the delay on the contract for NFTS.  Roberts [sic] attorney and our NFT experts just finished finalizing the formal details.  Look for an email today with the contract. The split is 50-50 on the initial drops and all resale royalties on secondary market will go to you."  Later that day, Casale responded in the group text message, "cool thanks guys."

89.    On April 30, 2021, DigiART transmitted an agreement (*i.e.*, the DigiART Agreement) to Casale to create NFTs for DigiART on an exclusive basis. In the email transmitting the DigiART Agreement to Casale, Mr. Martinez, explained that agreement provided for a "50-50 split" between Mr. Casale and DigiART.

90.    Shortly after sending that email, on April 30, 2021 at 4:25 Mr. Martinez texted the group chat with Mr. Katz and Casale, stating, "hey Dan, email sent.  Lmk [let me know] if you have questions."  Casale responded in the group text message shortly thereafter stating, "Awesome thanks, reviewing this afternoon.  Stoked [hang loose emoji]."

91.    After receiving this email and text message, Casale asked a single clarifying question over email regarding who would be responsible for "minting the NFTS."

92.   Once he received a response to his question, that same day, on April 30, 2021, Casale executed and delivered a signed contract to DigiART, exclaiming, "Attached is the signed agreement!  Super stoked for everything to come."

93.   Indeed, Casale repeatedly promised orally and in writing to DigiART during this time that he would abide by the terms of the DigiART agreement, and even transmitted his email signature expressly assenting to them.

94.   Casale promised and agreed to present NFTs created by him to DigiART for acceptance or rejection and to split proceeds of the sale of NFTs created by him during the one-year term of the agreement on a 50-50 basis with DigiART.

95.   Casale's representations were false and untrue when made.  Upon information and belief, Casale began creating the NFTs that are marketed under his Coolman_Universe moniker shortly after promising to DigiART that all NFTs created by him would be offered to DigiART for acceptance or rejection and proceeds split 50-50 with DigiART.  Put differently, Casale never intended to offer to DigiART the NFTs created by him for acceptance or rejection, and never intended to split the proceeds of sale of the NFTs created by him on a 50-50 basis with DigiART.

96.   Casale's promises were material to DigiART's decision to extensively market and promote his digital collection, as set forth above, and including but not limited to:

a) Organizing the "Ur Special Coffee" pop up exhibition at The Bagel Club during Art Basel to debut Casale to Miami Art Week;

b) Engaging in substantial marketing and advertising of Casale's work leading up to Art Basel by featuring his artwork on the homepage of Artplug.com, Marcelkatzart.com and FTX.US alongside other prominent artists;

c) Organizing a party during Miami Art Week to promote Casale's digital work during Miami Art Week;

d) Spending time and resources making strategic phone calls, text messages, and holding in person meetings with collectors; and

e) Strategically placing Casale's artwork in spaces to procure a market for his NFTs;

f) Purchasing canvases and supplies for Casale to create his art, and allowing Casale to utilize Mr. Katz's home studio on several occasions to create all of the artworks for the exhibitions and collections; and

g) Directing and instructing Casale on colorways, techniques and direction, and instructing Casale on how to implement the physical work into the future digital collection of NFTS with DigiART.

97. At the time Casale's representations were made, he knew or should have known that the representations he made to DigiART were false. In particular,

he knew that DigiART was expecting a 50-50 relationship for all Casale's NFT drops within the term of the contractual period.  Despite that, Casale immediately began plotting to launch a solo venture.

98.    Casale further intended that the representations would be relied and acted upon by DigiART.  In fact, Casale benefited considerably from DigiART's promotional activities, including those specified above.

99.    DigiART suffered harm from its justifiable reliance upon Casale's misrepresentations, and is entitled to injunctive relief as well as all available damages under applicable law, including compensatory, consequential, incidental, and punitive damages.

**WHEREFORE**, Plaintiff demands judgment by jury against Defendant for breach of contract, promissory estoppel, and misrepresentation, and compensatory, consequential, incidental, and punitive damages, the exact amount to be shown at trial, costs and expenses incurred in the instant action, attorneys' fees and costs, pre-judgment interest, post-judgment interest, and such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

DigiART hereby demands a trial by jury on all issues so triable.

Dated: March 8, 2022

Respectfully submitted,

NIMA H. MOHEBBI
nima.mohebbi@lw.com
*Lead Counsel*
MIRI GOLD
Miri.gold@lw.com
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
(213) 891-7482

*Admission Pro Hac Vice to be
Submitted*

/s/ *John N. Muratides*
JOHN N. MURATIDES, ESQ.
Florida Bar No. 332615
Jmuratides@stearnsweaver.com
lwade@stearnsweaver.com
401 E. Jackson Street, Suite 2100
Tampa, FL 33602
(813) 222-5089
MARIA A. FEHRETDINOV, ESQ.
mfehretdinov@stearnsweaver.com
Florida Bar No. 52084
150 West Flagler Suite 2200
Miami, FL 33130
(305) 789-3237
**STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A**.

ATTORNEYS FOR DIGIART, LLC