# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

## ORLANDO DIVISION

| | |
|---|---|
| DIGIART, LLC, a Florida limited liability company, | Civil Action No.: 6:22-cv-00494-WWB-DAB |
| *Plaintiff*, | **DEFENDANT DANNY CASALE'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; STATEMENT OF MATERIAL FACTS** |
| v. | |
| DANNY CASALE, an individual, | |
| *Defendant*. | |

**NOTICE OF MOTION**

Defendant Danny Casale ("Casale") hereby moves pursuant to Federal Rule of Civil Procedure 56, for an order of summary judgment against plaintiff DigiART, LLC ("Plaintiff"). Defendant is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact regarding the lack of agreement between the Defendant and Plaintiff, and Plaintiff's claims for fraud and promissory estoppel lack any evidentiary support.

This Motion is based on this Notice of Motion; the accompanying Memorandum of Points and Authorities, Statement of Material Facts; the Declarations of Danny Casale and Jordan Susman, and the exhibits thereto; the Court file; any Reply Memorandum Defendant may submit; and any further argument as may be presented to the Court.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Plaintiff DigiART LLC's claims all pivot on one dispositive issue: whether Plaintiff and Casale entered into an agreement.  The indisputable evidence demonstrates that the parties did not enter into a binding agreement.  There was no meeting of the minds between the parties, as they did not agree to "precisely the same thing, and at the same instant of time." *Holloway v. Gutman*, 707 So. 2d 356, 357 (Fla. 5th DCA 1998).

As an initial matter, **the purported agreement signed by Casale contained blanks for the allocation of net proceeds and the effective date**—the most basic material terms possible. **Plaintiff later unilaterally filled in those blanks**, but never delivered the revised purported agreement to Casale. In fact, Plaintiff never even

informed Casale that it had executed the agreement or that the term of the purported agreement had commenced.

Second, the purported agreement signed by Casale contained an integration clause and could only be modified by a written agreement signed by both parties, which prohibited Plaintiff from unilaterally making changes to the document, like it did.

Third, the purported agreement required Casale and Plaintiff to sign "identical copies," which they indisputably did not do—as Casale signed a document without an effective date or compensation structure, and Plaintiff signed a different document with those terms filled in.

Fourth, although Plaintiff has argued that the terms it unilaterally inserted into the purported agreement reflected communications between the parties, Plaintiff failed to include other terms from those exact same communications. In fact, the terms Plaintiff inserted into the purported agreement **contradicted** those same communications.

Fifth, there were no outward manifestations of either parties' consent to the terms of the purported agreement. In fact, when Plaintiff learned that Casale's company planned to mint 10,000 NFTs[1] in breach of the alleged agreement, Plaintiff encouraged Casale, and its members even invested in his project. In addition, Plaintiff's members congratulated Casale as Casale's company marketed and sold NFTs without Plaintiff— conduct Plaintiff now claims was a flagrant breach of the parties' purported agreement.

---

[1] An NFT (non-fungible token) is a digital asset that represents real-world objects like art, music, in-game items and videos. They are bought and sold online, frequently with cryptocurrency, and they are generally encoded with the same underlying software as many cryptos. Each NFT has a digital signature that makes it impossible for it to be exchanged for or equal to one another (hence, non-fungible). NFTs exist on a blockchain, which is a distributed public ledger that records transactions.

This is a simple case, as there was no meeting of the minds between Casale and Plaintiff. This summary judgment motion should be granted.

## II.    FACTUAL BACKGROUND

### A.  Casale Hires The Art Plug as His Fine Art Dealer

Casale is an artist. Marcel Katz is an art dealer who operates through an entity called The Art Plug LLC ("Art Plug"). In January 2021, Casale signed an agreement with Art Plug, pursuant to which Art Plug agreed to be Casale's official East Coast fine art representative (the "Fine Art Agreement"). SMF 1.

### B.  Casale and Plaintiff Discuss Working Together on an NFT Project, But Never Reach a Meeting of the Minds Regarding Terms of an Agreement

In March 2021, Katz began asking Casale if he would be interested in participating in the launch of the then-unnamed agency. SMF 2. Katz wanted Casale to create five NFTs and said Casale would receive 80% of the initial sale proceeds and 66% of the royalties from secondary sales. SMF 3.

On April 30, 2021, Chris Martinez ("Martinez"), an employee of Art Plug and "representative" of Plaintiff, sent a draft agreement to Casale (the "Incomplete Draft Agreement") from his Art Plug email address. SMF 4. The Incomplete Draft Agreement conspicuously omitted key terms and instead contained blanks for the "Effective Date" and "Allocation of Net Sale Proceeds." SMF 5. In the accompanying email, Martinez stated:

> This partnership is as follows:
> - 50/50 split on initial NFT drops
> - All secondary market royalties will go to you[2]

---

[2] The allocation of royalties from secondary sales cannot be underestimated. Unlike traditional fine art, where the artist only receives compensation from the initial sale, when NFTs are resold, the artist receives a royalty percentage from each resale. SMF 7.  The resale royalties for an NFT collection can run in the hundreds of thousands of dollars. *Id.*

- Top tier platform placements
- Marketing and PR push will be handled by us
- Placement and private sells with biggest collectors in NFT space
- Technical support: digital canvasses, AR/VR capabilities, digitization of physical art, etc
- Artist can terminate agreement for any reason with a 90 day written notice

SMF 6.

The purported terms of the "partnership" in Martinez's email differed substantially from the Incomplete Draft Agreement, including: (1) Martinez's email stated "50/50 split on initial NFT drops," whereas the Incomplete Draft Agreement was blank; (2) Martinez promised, "All secondary market royalties will go to you [Casale]," whereas the Incomplete Draft Agreement required Casale to split royalties from secondary sales 50/50 with Plaintiff, and; (3) Martinez's email did not mention exclusivity, whereas the Incomplete Draft Agreement stated: "[Company shall have the EXCLUSIVE right to market and offer for sale all NFTs produced by Artist during the Term] [Artist shall produce for Company to market and sell a minimum of five (5) NFTs per year during the Term]." SMF 8. Plaintiff never mentioned exclusivity in any of its communications with Casale. SMF 9. To the contrary, those communications envisioned Casale potentially doing a single, five NFT project with Plaintiff on a non-exclusive basis. *Id.*

On April 30, 2021, Casale sent to Katz, Martinez, and others a signed copy of the Incomplete Draft Agreement. SMF 10. That was the last he heard about the Incomplete Draft Agreement or their potential business relationship, or any obligations he might owe Plaintiff until February 2022. SMF 11.

Plaintiff never delivered to Casale a version of the Incomplete Draft Agreement with the blanks filled in, nor did Plaintiff ever deliver a countersigned version of the Incomplete Draft Agreement. SMF 12.  Plaintiff never informed Casale that it had

unilaterally filled in the compensation structure blanks in the Incomplete Draft Agreement (SMF 13), and Plaintiff never informed Casale that it had unilaterally decided upon an "Effective Date" of May 2, 2021, for the Purported Agreement or that the term of the agreement had commenced. SMF 14. Only on March 2, 2022—when counsel for Plaintiff sent to counsel for Casale a copy of the Purported Agreement—did Casale first see the Incomplete Draft Agreement with the blanks filled in and allegedly signed by Katz.[3] SMF 15.

### C. Subsequent Conduct Demonstrates Plaintiff's and Casale's Understanding that no Agreement Existed Between Them

In addition to the parties never reaching a meeting of minds regarding their potential "partnership," Plaintiff never contacted Casale about either party performing any of their obligations under the Purported Agreement. SMF 16. In fact, after Casale sent the Incomplete Draft Agreement, Plaintiff did nothing it was required to do under the Purported Agreement. Plaintiff did not educate Casale about NFTs, nor consult with Casale regarding any creative direction for proposed NFTs, nor assist Casale with digitizing/tokenizing NFTs, nor provide any of the services it would have been required to provide under the Purported Agreement if it were, in fact, a binding agreement. SMF 17. In fact, Plaintiff took numerous steps contrary to the terms of the Purported Agreement.

On May 5, 2021, Casale sent Katz a link to his personally minted NFTs. SMF 18. Katz did not mention that these NFTs violated Casale's exclusive agreement with Plaintiff or ask Casale to remove them. SMF 19. Thus, three days after the purported

---

[3] This brief will refer to the document executed by Casale as the "Incomplete Draft Agreement," and the document sent to Casale on March 2, 2022 and attached to the Complaint as Exhibit 1 as the "Purported Agreement."

effective date of the Purported Agreement, Katz was aware that Casale was selling NFTs without Plaintiff's involvement, allegedly in violation of the Purported Agreement, and said nothing.

In October 2021, Casale publicly announced the Coolman's Universe NFT Project to hundreds of thousands of people on Twitter and more than one million people on Instagram. SMF 20. Plaintiff was aware that Casale was planning to launch a line of NFTs in alleged breach of the Purported Agreement and said nothing. SMF 21.

On December 12, 2021, Katz texted Casale to ask how Katz could get on the "whitelist" (the pre-sale list) for the Coolman NFTs. SMF 22. On December 14, 2021, Katz texted Casale to make sure that he was on the NFT pre-sale list. *Id.* Between December 14-18, Katz texted Casale dozens of times and requested that Casale add over twenty people to the whitelist, **including other members of Plaintiff**. SMF 23. In addition, Katz repeatedly asked that Casale send Katz and his girlfriend the rarest NFTs—pieces with unique components that can be resold at significantly higher prices than NFTs with more generic components. SMF 24.

Leading up to the Coolman's Universe NFT Project, Giovani Yruela ("Yruela"), a director at DigiART, also asked Casale to place him on the pre-sale list, tried to purchase Casale's NFTs, and then congratulated Casale on the Coolman NFT Project. SMF 25. At no point in any of these communications did Katz or Yruela mention Plaintiff or its alleged exclusive agreement with Casale, or that the upcoming sale of NFTs would be a breach of the Purported Agreement. SMF 26.

On December 18, 2021, the Coolman's Universe NFT Project launched to overwhelming success, selling out within minutes. Casale informed Katz immediately

after the NFT project launched, and Katz announced on social media that he purchased Coolman's Universe NFTs. SMF 27.

On December 19, 2021, Katz asked Casale why The Art Plug was not listed on the Coolman's Universe NFT Project's roadmap and insisted it be added. SMF 28. Tellingly, Katz did not question why Plaintiff was not listed on the roadmap. *Id.* Nor did Katz mention anything about Plaintiff, Casale's alleged agreement with Plaintiff, or that Casale was in breach of the Purported Agreement. (At his deposition, Katz stated that he was personally involved in and helped promote the Coolman's Universe NFT project—the very project that he now claims constitutes Casale's alleged breach of the Purported Agreement.) SMF 29.

Between December 19 and 26, 2021, after the Coolman's Universe NFT Project launch, Katz wrote Casale on several occasions to request rare NFTs, or to request that Casale send him free NFTs, and to request that Casale rig NFT giveaways so that Katz would win. SMF 30.

On December 27, 2021, Katz connected Casale with a writer at Forbes magazine who wanted to write an article about the Coolman Universe NFT drop. SMF 31. And on January 5, 2022, Katz offered to help Casale get the Coolman's Universe account verified on Twitter in order to help with the Coolman's Universe NFT Project. SMF 32.

### D. Katz Tries To Join The Coolman's Universe NFT Project

After the launch of the Coolman's Universe NFT Project, between December 19 and February 8, 2022, Katz and Casale communicated frequently about the Coolman's Universe NFTs and Katz repeatedly tried to insert himself into the Coolman's Universe NFT Project, by proposing events, investments, partnerships, and merchandise that he could allegedly make happen. SMF 33. In January and February 2022, Katz asked

7

Casale for an official position on the Coolman's Universe NFT Project. SMF 34. At no

point did Katz mention any purported agreement between Casale and Plaintiff. *Id.*

On February 18, 2022—nine months after Casale sent Katz a link to his

personally minted NFTs, and four months after Casale publicly announced the

Coolman's Universe NFT Project, and two months after the Coolman's Universe NFT

Project launched, and after Earl and Yruela had personally congratulated Casale on the

Coolman's Universe NFT Project, and after Katz had repeatedly tried to join the

Coolman's Universe NFT Project—did Plaintiff send a letter to Casale alleging the

existence of the Purported Agreement. SMF 35.

## III.    SUMMARY JUDGMENT STANDARD

A party seeking summary judgment must demonstrate that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a -

matter of law." Fed. R. Civ. P. 56(c); *see also Maniccia v. Brown,* 171 F.3d 1364, 1367

(11th Cir. 1999). The movant bears the initial responsibility of informing the Court of the

basis for its motion and of identifying those materials which demonstrate the absence of

a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

In responding to a motion for summary judgment, the adverse party may not rest

upon mere allegations or denials, but "must set forth specific facts which show a

genuine issue for trial." Fed. R. Civ. P. 56(e). To be clear, the adverse party must set

forth more than the "mere existence of *some alleged factual dispute* between the parties

will not defeat an otherwise properly supported motion for summary judgment."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986) (emphasis added). "[T]he

requirement is that there be *no genuine issue of material fact.*" *Id.* (emphasis added). If

the adverse party fails to "make a sufficient showing on an essential element of [its]

case with respect to which [it] has the burden of proof," then the Court must

enter summary judgment for the moving party. *Celotex Corp.,* 477 U.S. at 323.

## IV.   ARGUMENT

### A.  THE UNDISPUTED FACTS SHOW THAT PLAINTIFF'S BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW

It is elementary that no contract can be formed without a "meeting of the

minds"—that is, mutual assent. *See In re Harrell*, 351 B.R. 221, 244 (Bankr. M.D. Fla.

2006) ("In order to form a valid contract, actual assent by the parties upon exactly the

same matters is indispensable."). Put simply, "there must be a meeting of the minds on

all essential terms and obligations" for a contract to be binding. *Browning v. Peyton*, 918

F.2d 1516, 1521 (11th Cir. 1990). "In the making of a valid contract, the parties must not

only be capable of an intelligent assent, but they must actually give their assent; and

**the assent must be precisely the same thing, and at the same instant of time**."

*Strong & Trowbridge Co. v. H. Baars & Co.*, 60 Fla. 253, 256 (Fla. Sup. Ct. 1910);

(emphasis added); *Winter Haven Citrus Growers Ass'n v. Campbell & Sons Fruit*

*Co.*, 773 So. 2d 96, 97 (Fla. 2d DCA 2000) ("Whether a contract is oral or written, it is

essential that the parties mutually agree upon the material terms.").

The question of whether a meeting of the minds occurred, and the parties

intended to form a binding contract, is determined by examining the language of the

document in question and the surrounding circumstances. *Midtown Realty, Inc. v.*

*Hussain,* 712 So. 2d 1249, 1251-52 (Fla. 3rd DCA 1998).

### i.   The Incomplete Draft Agreement Signed by Casale Did Not Contain Essential Contract Terms

A valid contract must contain "sufficient specification of essential terms." *St. Joe*

*Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. Sup. Ct. 2004). In *Morris Hatchery, Inc. v.*

*Interlink Grp. Corp. USA, Inc.*, No. 10-24480-CIV, 2012 WL 13012423, at *1 (S.D. Fla. Apr. 16, 2012), a hatching eggs exporter attempted to enter into an exclusive agreement with a wholesaler, but the agreement did not include "an expiration date or essential terms such as price, quality or timing." The Court, when presented with the agreement, held that it did "not contain a mutual agreement to the terms essential to a contract" and "cannot survive as a stand-alone contract." *Id.* at *4.

Here, it is indisputable that the Incomplete Draft Agreement signed by Casale did not contain material terms, including the effective date or the compensation structure. SMF 5, 10. Plaintiff unilaterally filled in those terms at an unknown later date and never delivered a copy to Casale. SMF 12-15. Therefore, the parties did not agree to the same things at the same time, and Plaintiff's claim for Breach of Contract fails as a matter of law.

### ii.   Plaintiff Cannot Create a Binding Agreement by Unilaterally Filling in Terms

Plaintiff has attempted to salvage the Purported Agreement (and avoid a motion to dismiss pursuant to FRCP 12(b)(6)) by alleging that Casale executed an agreement that contained all material terms. Compl. ¶ 28. That is a knowingly false statement by Plaintiff. The document signed by Casale did not contain an "Effective Date" or an "Allocation of Net Sale Proceeds." SMF 5, 10.

 The undisputed facts show that Plaintiff unilaterally modified the Incomplete Draft Agreement, and Casale never consented to the modification. SMF 11-15. Plaintiff's modification was a "material variation of the agreement, so as to be no more than a counter-offer." *Binninger v. Hutchinson*, 355 So.2d 863, 865 (Fla. 1st DCA 1978); *see also, Padron v. Plantada*, 632 So.2d 113 (Fla. 3d DCA), *review denied*, 639 So.2d 980 (Fla. 1994) ("an unspecified floating [interest] rate did not mirror the terms of the

parties' agreement and thus constituted a counteroffer, which rejected the original contract terms"). Because there was no subsequent consent by Casale to the terms that Plaintiff unilaterally added to the Incomplete Draft Agreement, there was "no meeting of the minds," and no contract was consummated.

Plaintiff has also attempted to salvage the Purported Agreement by alleging that Casale agreed to its terms in the email between him and Martinez to which the Incomplete Draft Agreement was attached. This too is false.

**First**, the Incomplete Draft Agreement contains a merger clause that states it can only be modified by a written agreement signed by both parties. SMF 36.

In *Environmental Services, Inc. v. Carter*, 9 So. 3d 1258, 1265 (Fla. 5th DCA 2009) the court held, "Although the existence of a merger clause does not conclusively establish that the integration of the agreement is total, it is a highly persuasive statement that the parties intended the agreement to be totally integrated and generally works to prevent a party from introducing parol evidence to vary or contradict the written terms."

The Incomplete Draft Agreement that Casale signed expressly prohibited Plaintiff from doing what it indisputably did when it added terms to the document. In alleging the existence of an agreement, Plaintiff not only ignored the merger clause but selectively cherry-picked portions of Martinez's email for inclusion in the Purported Agreement that Casale did not sign. Plaintiff's attempt to incorporate some terms from Martinez's email into the Incomplete Draft Agreement, while ignoring other terms demonstrates that the parties did not agree to the same things at the same time.

**Second**, the parties' failure to agree to the same thing at the same time is readily apparent with respect to compensation. Plaintiff repeatedly told Casale he would

receive the majority of the sales proceeds. SMF 3, 6. In fact, the very email Plaintiff sent to Casale with the Incomplete Draft Agreement promised in black and white: "50/50 split on initial NFT drops" and "All secondary market royalties will go to you"—but the Purported Agreement provides for secondary sales to be split 50/50. SMF 6, Compl. Ex.A. Consequently, the Incomplete Draft Agreement fails as a matter of law because the parties clearly did not agree to the same thing at the same time.

**Third**, there was no meeting of the minds between the parties as to when the purported agreement would take effect. The "Effective Date" on the agreement was blank when it was provided to Casale. SMF 5. And the Incomplete Draft Agreement that Casale signed and sent to Plaintiff also did not have an effective date. SMF 5, 10. At some point, Plaintiff unilaterally inserted an effective date of May 2, 2021, without discussing it with Casale or obtaining his consent. SMF 12, 14. Thus, the parties, yet again, did not agree to the same thing at the same time.

Lest there be any doubt, the effective date is a substantial material term, as Plaintiff was still in its infancy in May 2021, and DigiART did not even have Twitter account until January 2022 or a Discord server until June 2022 – two things essential for NFT projects. SMF 37. Moreover, had Plaintiff informed Casale that the effective date had begun, Casale would have terminated the Purported Agreement before he launched his Coolman Universe project. SMF 38.

### iii.     The Purported Agreement Fails According to Its Own Terms

The Purported Agreement provides in relevant part: "The parties may sign and deliver this Agreement in counterparts, . . .and **when taken together with all other identical copies of this Agreement also signed in counterpart**, shall be considered as one agreement." SMF 39. Therefore, Casale and Plaintiff clearly agreed that there

would be no agreement until they both signed identical agreements, which they did not do.

Casale signed the Incomplete Draft Agreement that omitted key material terms. SMF 5, 10. While Plaintiff executed a very different agreement that Casale did not see until Plaintiff attached it to a demand letter. SMF 12, 15. Consequently, no agreement exists between the parties.

### iv.   The Parties' Subsequent Conduct Demonstrates Their Understanding That No Agreement Was Reached

> Justice Holmes wrote, "The law has nothing to do with the actual state of the parties' minds. In contract, as elsewhere, it must go by externals, and judge parties by their conduct." Oliver Wendell Holmes, The Common Law 242 (Howe ed. 1963); see also A. Corbin, Corbin on Contracts, § 9 (1952) ("It is by the conduct of the two parties, by their bodily manifestations, that we must determine the existence of what is called agreement.")

*United States v. Blankenship*, 382 F.3d 1110, 1134 (11th Cir. 2004); *see also Venus Lines Agency, Inc. v. CVG Int'l Am., Inc.*, 234 F.3d 1225, 1229 (11th Cir. 2000) (holding that the conduct of the parties demonstrated there was no meeting of minds).

Here, Casale's and Plaintiff's subsequent conduct is clear. Neither party acted as if there was agreement**.**  Plaintiff was well aware that Casale was involved in his own NFT project and actively encouraged the project for its own gain:

- After the effective date of the Purported Agreement—Katz and Casale discussed Casale's independent creation and sale of NFTs. SMF 18, 19.

- December 2021, Katz and Yruela requested that Casale add them and other members of Plaintiff to the Coolman NFT Project pre-sale list. SMF 21-26.

- December 2021, Katz repeatedly asked Casale to send him free NFTs, to give him rare NFTs that would have higher resale values, and to rig NFT giveaways so that Katz could win. SMF 24, 30.

- Plaintiff never mentioned that the Coolman NFT Project was a breach of the Purported Agreement. SMF 21, 26, 29.

13

In its Complaint, Plaintiff alleged seven categories of work that it allegedly performed as services under the Purported Agreement. (Compl. ¶ 80).  Each of these allegations is false as demonstrated by undisputed evidence:

- Plaintiff's allegations that it organized a pop-up exhibition and party during Miami Art Week 2022 are contradicted by its admission at deposition that it was not involved with any events prior to March 2022 and Katz's claim that he—not DigiART—spent money on the events. SMF 40, 41.

- Plaintiff's allegation that it marketed and advertised Casale's work on Artplug.com and Marcelkatzart.com is contradicted by an admission that such conduct was performed by Art Plug—not Plaintiff—as part of Art Plug's obligations pursuant to the Fine Art Agreement. SMF 42.

- Plaintiff's allegation that it organized a party during Miami Art Week 2022 to promote Casale's digital artwork is contradicted by its admission at deposition that it did not work on any events prior to March 2022. SMF 40.

- Plaintiff's allegation that it spent time and resources making phone calls and text messages is contradicted by its attorney's admission that Art Plug—not Plaintiff—spent time and resources making phone calls and text messages to "increase[] [Casale's] exposure by introducing his work to well-known and important individuals in the artistic community." SMF 43.

- Plaintiff's allegation that it purchased canvasses and supplies for Casale to create his art is contradicted by its attorney, who claimed that Art Plug "fronted all of the funds for supplies used by Mr. Casale to create his artwork." SMF 44.

- Plaintiff's allegation that it instructed Casale on how to implement physical work into future digital collections is contradicted by its admission at deposition that it never assisted Casale with digitizing or tokenizing any NFTs. SMF 17.

In addition, Plaintiff falsely alleged in the Complaint that Katz purchased two domain names for Casale. SMF 45.

## B.  THE UNDISPUTED FACTS SHOW THAT PLAINTIFF'S FRAUD / MISREPRESENTATION CLAIM FAILS AS A MATTER OF LAW

Florida law is clear: "contract principles are more appropriate than tort principles to resolve purely economic claims." *Airport Rent–A–Car v. Prevost Car,* 660 So.2d 628 (Fla. 1995); *Florida Power & Light Co. v. Westinghouse Elec. Corp.,* 510 So.2d 899, 900

(Fla. 1987). Florida courts apply the economic loss rule to prevent tort recovery "when damages flow from a breach of contract unless the tort is independent of the breach of contract" *Brass v. NCR Corp.,* 826 F. Supp. 1427, 1428 (S.D. Fla. 1993). As such, a plaintiff's fraud claim is "barred by the economic loss rule if its claims are factually 'interwoven' with the breach of contract claim." *Fla. Coll. of Osteopathic Med., Inc. v. Dean Witter Reynolds Inc.*, 982 F. Supp. 862, 866 (M.D. Fla. 1997).

Here, Plaintiff's breach of contract and fraud claims are based on the same alleged promises and same alleged damages. Both claims allege that Casale promised to abide by the terms of the Purported Agreement and to create NFTs for DigiART on an exclusive basis. SMF 46. Both claims allege the same damages—Plaintiff's alleged expenditures pursuant to the DigiART agreement. SMF 47. Plaintiff's fraud claim is nothing more than a cheap attempt to turn a contract dispute into a tort claim and should be dismissed.

Even if Plaintiff's fraud claim was separate from its breach of contract claim (it is not), the fraud claim would still fail as a matter of law because the expenditures Plaintiff alleges as damages were not expended by Plaintiff. As explained above, those expenditures were either provided by Art Plug pursuant to the Fine Art Agreement (as alleged by Plaintiff's attorney) or by Casale. SMF 41-44. Thus, summary judgment should be issued in favor of Casale on Plaintiff's fraud claim.

## C.    THE UNDISPUTED FACTS SHOW THAT PLAINTIFF'S PROMISSORY ESTOPPEL CLAIM FAILS AS A MATTER OF LAW

Plaintiff is unable to establish the essential elements of a claim for promissory estoppel. It cannot show that: (1) Casale made a promise which he reasonably expected to induce action or forbearance, (2) Plaintiff acted in reasonable reliance on that promise, or (3) Plaintiff changed its position in reliance on Casale's purported

promises to its detriment. *Romo v. Amedex Ins. Co.*, 930 So. 2d 643, 650 (Fla. 3rd DCA 2006).

First, it is unreasonable as a matter of law for a party to rely upon another party's alleged promise to proceed with a transaction if the execution of a written document was contemplated. *See SEB S.A. v. Sunbeam Corp.*, 148 Fed. Appx. 774, 798 (11th Cir. 2005) ("Florida law consistently recognizes that a basic tenet of contract law [is] that reliance on representations by a contracting party in a suit based on the contract is unreasonable where the representations are not contained in the subsequent written agreement between the parties.") (citing *Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1428 (S.D. Fla. 1996)).

Second, Casale never made a promise "to present NFTs created by him to DigiART for acceptance or rejection and to split proceeds of the sale of NFTs created by him during the one year term of the agreement on a 50-50 basis with DigiART." (Compl. ¶ 78). Casale and Plaintiff engaged in an arms-length negotiation regarding potentially working together on an NFT project but never agreed on the compensation structure, as demonstrated by the conflicting terms in the Purported Agreement, the email from Plaintiff, and the text messages from Katz. SMF 3-6, 8, 9. Nor did they ever agree upon a start date for the Purported Agreement's term. SMF 14.

Third, even if Plaintiff were to argue that it perceived Casale's transmittal of a signed document as a "promise", that document contradicted the parties' communications and omitted critical material terms of the parties' arrangement, including a commencement date and a compensation structure. SMF 3-6, 8, 9.

Fourth, there was no "reliance" by Plaintiff. It never informed Casale that the one-year term had commenced, and it took no actions in reliance on Casale's alleged

promises. SMF 16, 17, 40-45. Plaintiff at no time acted as if it had an exclusive

agreement—or any agreement—with Casale. SMF 16-19, 21-34, 40-45.

## V.    CONCLUSION

The undisputed facts of this case clearly establish that Plaintiff cannot, as a

matter of law, succeed on its claims. Casale respectfully requests that summary

judgment be granted in full and that he be awarded his attorney's fees and costs.

## STATEMENT OF MATERIAL FACTS

1.    In January 2021, Casale signed an agreement with Art Plug pursuant to

which Art Plug agreed to be Casale's official East Coast fine art representative. Casale

Decl. ¶ 7; Katz Depo. Vol. II, Ex. A, pg. 46:6-8, 107:13-15, and Ex. 6.

2.    In March 2021, Katz began asking Casale if he would be interested in

participating in the launch of the then-unnamed agency. Casale Decl. ¶ 12; Katz Depo.

Vol. II, Ex. A, pg. 122:1-125:15 and Ex. 8.

3.    Katz wanted Casale to create five NFTs and said Casale would receive

80% of the initial sale proceeds and 66% of the royalties from secondary sales. Casale

Decl. ¶ 12; Katz Depo. Vol. II, Ex. A, Ex. 8; Yruela Depo., Ex. C, pg. 38:5-18.

4.    On April 30, 2021, Chris Martinez, an employee of Art Plug and

"representative" of Plaintiff, sent a draft agreement to Casale from his Art Plug email

address. Casale Decl. ¶ 16; Katz Depo. Vol. II, Ex. A, pg. 151:13-152-8, 171:19-172:7,

and Exs. 10 & 11; Yruela Depo., Ex. C, pg. 60:24-61:12, 69:13-24, and Exs. 5 & 6.

5.    The Incomplete Draft Agreement omitted key terms and instead contained

blanks for the "Effective Date" and "Allocation of Net Sale Proceeds." Katz Depo. Vol. II,

Ex. A, pgs. 171:19-172:16 and Ex. 11; Yruela Depo., Ex. C, pgs. 69:13-70:8 and Ex. 6.

6.    In the accompanying email, Martinez stated:
This partnership is as follows:

- 50/50 split on initial NFT drops
- All secondary market royalties will go to you
- Top tier platform placements
- Marketing and PR push will be handled by us
- Placement and private sells with biggest collectors in NFT space
- Technical support: digital canvasses, AR/VR capabilities, digitization of physical art, etc
- Artist can terminate agreement for any reason with a 90 day written notice

Katz Depo. Vol. II, Ex. A, pgs. 151:13-152:16 and Ex. 10; Yruela Depo., Ex. C, pgs. 60:24-61:8, 63:16-22, and Ex. 5.

7.      When NFTs are resold, the artist receives of royalty percentage from each resale. The resale royalties for an NFT collection can run in the hundreds of thousands of dollars. Casale Decl. ¶ 18; Katz Depo. Vol. II, Ex. A, pg. 149:17-150:9, 161:14-162:1; Yruela Depo., Ex. C, pgs. 59:15-60:1 and 60:11-22.

8.      The purported terms of the "partnership" in Martinez's email differed substantially from the Incomplete Draft Agreement, including: (1) Martinez's email stated "50/50 split on initial NFT drops," whereas the Incomplete Draft Agreement was blank; (2) Martinez promised, "All secondary market royalties will go to you [Casale]," whereas the Incomplete Draft Agreement required Casale to split royalties from secondary sales 50/50 with Plaintiff, and; (3) Martinez's email did not mention exclusivity, whereas the Incomplete Draft Agreement stated: "[Company shall have the EXCLUSIVE right to market and offer for sale all NFTs produced by Artist during the Term] ] [Artist shall produce for Company to market and sell a minimum of five (5) NFTs per year during the Term]." Casale Decl. ¶ 20; Katz Depo. Vol. II, Ex. A, pg. 151:13-152:8, 168:22-169:19, 171:19-172:16, 198:5-11, and Exs. 10 & 11; Yruela Depo., Ex. C, pg. 14:14-16, 60:24-61:12, 63:16-22, 69:13-70:8 and Exs. 5 & 6.

9.      Plaintiff never mentioned exclusivity in any of its communications with Casale. Rather, those communications envisioned Casale potentially doing a single, five NFT project with Plaintiff on a non-exclusive basis. Casale Decl. ¶ 20-22; Katz Depo. Vol. II, Ex. A, pgs. 123:16-124:11, 148:16-149-7, and Exs. 8 & 10; Yruela Depo., Ex. C, pgs. 38:5-18, 71:14-17, and Ex. 2.

10.     On April 30, 2021, Casale sent to Katz, Martinez, and others a signed copy of the Incomplete Draft Agreement. Casale Decl. ¶ 24; Katz Depo. Vol. II, Ex. A, pg. 182:21-183:24, 187:18-24, and Ex. 12; Yruela Depo., Ex. C, pg. 69:22-70:8, 72:22-73:16, and Ex. 7.

11.     That was the last Casale heard about the Incomplete Draft Agreement or their potential business relationship, or any obligations he might owe Plaintiff until February 2022. Casale Decl. ¶ 25; Katz Depo. Vol. II, Ex. A, pg. 245:4-8; Yruela Depo., Ex. C, pg. 119:14-22.

12.     Plaintiff never delivered to Casale a version of the Incomplete Draft Agreement with the blanks filled in, nor did Plaintiff ever deliver a countersigned version of the Incomplete Draft Agreement. Casale Decl. ¶ 26; Katz Depo. Vol. II, Ex. A, pg. 183:25-184:6, 189:14-19, 189:24-190:1, and Ex. 13; Yruela Depo., Ex. C, pg. 73:17-21, 78:21-25, 79:12-25, and Ex. 4.

13.     Plaintiff never informed Casale that it had unilaterally filled in the compensation structure blanks in the Incomplete Draft Agreement. Casale ¶ 27; Katz Depo. Vol. II, Ex. A, pg. 186:1-3, 189:6-19; Yruela Depo., Ex. C, pg. 16:9-19.

14.     Plaintiff never informed Casale that it had unilaterally decided upon an "Effective Date" of May 2, 2021, for the Purported Agreement or that the term of the agreement had commenced. Casale ¶ 27; Katz Depo. Vol. II, Ex. A, pg. 186:1-3.

15.     Only on March 2, 2022 did Casale first see the Incomplete Draft Agreement with the blanks filled in and allegedly signed by Katz. Casale ¶ 28.

16.     Plaintiff never contacted Casale about either party performing any of their obligations under the Purported Agreement. Casale ¶ 29; Yruela Depo., Ex. C, pg. 108:15-109:7, 119:14-22.

17.     Plaintiff did not educate Casale about NFTs, nor consult with Casale regarding any creative direction for proposed NFTs, nor assist Casale with digitizing/tokenizing NFTs, nor provide any of the services it would have been required to provide under the Purported Agreement if it were, in fact, a binding agreement. Casale Decl. ¶ 30; Katz Depo. Vol. II, Ex. A, pg. 201:21-202:1, 202:10-14, 205:22-25, 207:22-208:2, 209:5-7, 213:4-215:10, 216:2-217:21; Yruela Depo., Ex. C, 84:23-85:21, 87:21-87:24, 89:4-10, 96:25-97:2, 97:9-11, 99:1-5, 100:24-101:4, 101:16-18, 103:16-105:4.

18.     On May 5, 2021, Casale sent Katz a link to his personally minted NFTs. Casale Decl. ¶ 32; Katz Depo. Vol. II, Ex. A, pg. 217:22-218:3, 218:18-219:4, and Ex. 14; Katz Depo. Vol. III, Ex. B, pg. 156:14-19.

19.     Katz did not mention that these NFTs violated an exclusive agreement with Plaintiff or ask Casale to remove them Casale Decl. ¶ 34; Katz Depo. Vol. II, Ex. A, pg. 217:22-218:3, 218:18-219:12, and Ex. 14.

20.     In October 2021, Casale publicly announced the Coolman's Universe NFT Project to hundreds of thousands of people on Twitter and more than one million people on Instagram. Casale Decl. ¶ 37; Katz Depo. Vol. II, Ex. A, pg. 248:16-20, 249:2-5, 249:11-13, 249:18-23, 250:2-7, 255:4-9, 255:22-25, and Ex. 21.

21.     Plaintiff was aware that Casale was planning to launch a line of NFTs in alleged breach of the Purported Agreement and said nothing. Katz Depo. Vol. III, Ex. B, pgs. 28:17-23, 34:12-35:2, 53:14-16, 67:8-21, 72:22-73:22, 74:1-14, and Ex. 22; Yruela Depo., Ex. C, pgs. 108:10-109:7, 110:15-25, 111:12-17, 113:20-114:1, and 114:24-115:4.

22.     On December 12 and 14, 2021, Katz texted Casale to ask about getting on the pre-sale list for the Coolman's Universe NFTs. Casale Decl. ¶¶ 39, 42; Katz Depo. Vol. III, Ex. B, pg. 27:9-19, 28:5-23, 52:4-53:2 and Exs. 22, 24.

23.     Between December 14-18, Katz texted Casale dozens of times and requested that Casale add over twenty people to the whitelist, including other members of Plaintiff. Casale Decl. ¶ 44; Katz Depo. Vol. III, Ex. B, pg. 39:5-40:15, 52:4-54:21, 55:4-7, 57:1-5, 58:14-59:9, 61:13-25; 62:21-24, 63:14-64:10, 65:20-66:2, and Exs. 24 & 25; Yruela Depo., Ex. C, pg. 109:8-17.

24.     Katz repeatedly asked that Casale send Katz and his girlfriend the rarest NFTs. Casale Decl. ¶¶ 46, 48; Katz Depo. Vol. III, Ex. B, pg. 64:17-65:3, and Ex. 25.

25.     Giovani Yruela, a director at DigiART, also asked Casale to place him on the pre-sale list, tried to purchase Coolman's Universe NFTs, and then congratulated Casale on the Coolman's Universe NFT Project. Casale Decl. ¶ 49 and Ex. G; Yruela Depo., Ex. C, pg. 109:8-17, 110:11-20, and 111:8-11.

26.     At no point in any of these communications did Katz or Yruela mention Plaintiff or its alleged exclusive agreement with Casale, or the sale of the Coolman's Universe NFTs would be a breach of the Purported Agreement. Casale Decl. ¶ 51; Yruela Depo., Ex. C, pg. 108:10-109:7 and 111:12-17.

27.     On December 18, 2021, the Coolman's Universe NFT Project launched to overwhelming success, selling out within minutes. Casale informed Katz immediately after the NFT project launched, and Katz announced on social media that he purchased Coolman's Universe NFTs. Casale Decl. ¶ 52; Katz Depo. Vol. III, Ex. B, pg. 66:10-15; 158:13-17, 159:7-25, 160:1-9, 160:14-19, and Ex. 36.

28.     On December 19, 2021, Katz asked Casale why The Art Plug was not listed on the Coolman's Universe NFT Project's roadmap and insisted it be added. Tellingly, Katz did not question why Plaintiff was not listed on the roadmap Casale Decl. ¶¶ 54, 56; Katz Depo. Vol. III, Ex. B, pg. 76:6-77:20 and Ex. 26.

29.     Katz did not mention anything about Plaintiff, Casale's alleged agreement with Plaintiff, or that Casale was in breach of his purported agreement with Plaintiff. (In fact, at his deposition, Katz stated that he was personally involved in and helped promote the Coolman's Universe NFT project that Katz now claims constitutes Casale's alleged breach of the Purported Agreement.) Casale Decl. ¶ 57; Katz Depo. Vol. III, Ex. B, pg. 76:6-77:20, 85:4-8, 86:22-87:11, and Ex. 26.

30.     Between December 19 and 26, 2021, after the Coolman's Universe NFT Project launch, Katz wrote Casale on several occasions to request rare NFTs, to request that Casale send him free NFTs, and to request that Casale rig NFT giveaways so that Katz would win. Casale Decl. ¶ 59; Katz Depo. Vol. III, Ex. B, pg. 82:20-83:20, 84:14-17, 88:6-89:22, and Exs. 27 & 28.

31.     On December 27, 2021, Katz connected Casale with a writer at Forbes magazine who wanted to write an article about the Coolman's Universe NFT drop. Casale Decl. ¶ 61 and Ex. H; Yruela Depo., Ex. C, pg. 89:23-91:2 and Ex. 29.

32.     On January 5, 2022, Katz offered to help Casale get the Coolman's Universe account verified on Twitter in order to help with the Coolman's Universe NFT project. Casale Decl. ¶ 63; Katz Depo. Vol. III, Ex. B, pg. 93:19-22, 96:9-19.

33.     After the launch of the Coolman's Universe NFT Project, between December 19 and February 8, Katz repeatedly tried to insert himself into the Coolman's Universe NFT Project, by proposing events, investments, partnerships, and merchandise that he could allegedly make happen. Casale Decl. ¶ 65; Katz Depo. Vol. III, Ex. B, pg. 82:20-83:20, 84:14-17, 88:6-89:22, 92:6-9, 93:2-17, 93:18-22, 95:6-15, 96:2-19, 97:24-98:3, 98:10-99:20, 102:9-20, 102:23-103:6, 104:19-105:24, and Exs. 27, 28, 31, 32.

34.     In January and February 2022, Katz asked Casale for an official position on the Coolman's Universe NFT Project. At no point did Katz mention any purported agreement between Casale and Plaintiff. Casale Decl. ¶¶ 67, 69; Katz Depo. Vol. III, Ex. B, pg. 82:20-83:20, 84:14-17, 88:6-89:22, 92:6-9, 93:2-22, 95:6-15, 96:2-19, 97:24-98:3, 98:10-99:20, 102:9-20, 102:23-103:6, 104:19-105:24, and Exs. 27, 28, 31, 32; Yruela Depo., Ex. C, pg. 111:18-21.

35.     On February 18, 2022 Plaintiff sent a letter to Casale alleging the existence of the Purported Agreement. Casale Decl. ¶ 71; Yruela Depo., Ex. C, pg. 114:24-115:4, 120:2-4, and Ex. 12.

36.     The Incomplete Draft Agreement contains a merger clause that states it can only be modified by a written agreement signed by both parties. Katz Depo. Vol. II, Ex. A, Ex. 12; Yruela Depo., Ex. C, Ex. 7.

37.     Plaintiff was still in its infancy in May 2021, and DigiART did not even have Twitter account until January 2022 or a Discord server until June 2022 – two things

essential for NFT projects. Casale Decl. ¶ 73 and Ex. I; Katz Depo. Vol. II, Ex. A, pg. 83:13-17, 84:2-5; Susman Decl., Ex. 1.

38.     Had Plaintiff informed Casale that the effective date had begun, Casale would have terminated the Purported Agreement before he launched the Coolman's Universe project. Casale Decl. ¶ 75.

39.     The Purported Agreement provides in relevant part: "The parties may sign and deliver this Agreement in counterparts, . . . and when taken together with all other identical copies of this Agreement also signed in counterpart, shall be considered as one agreement." Dkt. 1 (Compl.), Ex. A.

40.     Plaintiff did not work on any events prior to March 2022. Casale Decl. ¶ 76-80 and Ex. J & K; Yruela Depo., Ex. C, pg. 22:20-23-9, 34:6-14, 35:12-14.

41.     DigiART spent no money on the UR Special coffee pop-up exhibition during Miami Art Week 2021. Casale Decl. ¶ 76-80; Katz Depo. Vol. II, Ex. A, pg. 57:5-18, 57:24-58:4; Yruela Depo., Ex. C, pg. 22:20-23:9, 34:6-14, 35:12-14.

42.     The marketing and advertising of Casale's work on Artplug.com and Marcelkatzart.com was performed by Art Plug as part of Art Plug's obligations under the Fine Art Agreement. Susman Decl., Ex. 2; Casale Decl. ¶ 81.

43.     Art Plug spent time and resources making phone calls and text messages to "increase[] [Casale's] exposure by introducing his work to well-known and important individuals in the artistic community." Susman Decl., Ex. 2; Casale Decl. ¶ 82.

44.     Art Plug "fronted all of the funds for supplies used by Mr. Casale to create his artwork." Susman Decl., Ex. 2.; Katz Depo. Vol. II, Ex. A, pg. 169:20-24; Katz Depo. Vol. III, Ex. B, pg. 125:22-126:3.

45.     Plaintiff falsely alleged in the Complaint that Katz purchased two domain names for Casale. Katz Depo. Vol. III, Ex. B, pg. 147:10-16, 148:9-149:19.

46.     Both claims allege that Casale promised to abide by the terms of the Purported Agreement and to create NFTs for DigiART on an exclusive basis. Dkt. 1, pg. 22, para. 57 & pg. 25, paras. 70-71.

47.     Both claims allege the same damages—Plaintiff's alleged expenditures pursuant to the DigiART agreement. Dkt. 1, pg. 12, para. 34 to pg. 18, para. 48.

Dated: February 24, 2023

Respectfully submitted,

| | |
|---|---|
| ____/s/ Jordan Susman_____ | KENNETH G. TURKEL |
| JORDAN SUSMAN | Florida Bar No. 867233 |
| jsusman@nolanheimann.com | kturkel@tcb-law.com |
| LEAD COUNSEL | **TURKEL CUVA BARRIOS** |
| Margo J. Arnold | 100 N. Tamp St. Ste. 1900 |
| marnold@nolanheimann.com | Tampa, FL 33602 |
| **NOLAN HEIMANN LLP** | 813-834-9191 |
| 16000 Ventura Blvd. Ste. 1200 | |
| Encino, CA 91436 | |
| 818-574-5710 | |